**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAHI WHITE,** | : | **Case No. 1:07 CV 89** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **FORD MOTOR COMPANY,** | : | **OPINION & ORDER** |
| | : | |
| **Defendants.** | : | |

This case arises on Defendant Ford Motor Company's ("Ford") *Motion for Summary Judgment* (ECF Doc. 37). Ford is seeking dismissal of the Complaint filed by Plaintiff Jahi White, arguing that it is entitled to judgment as a matter of law because White cannot set forth any genuine issue of material fact with respect to his race discrimination claims. The motion has been fully briefed and is ripe for resolution.[1] For the reasons fully articulated below, Ford's motion is **GRANTED**.

## I.   BACKGROUND

_____This is an employment discrimination case in which the African-American Plaintiff, Jahi White ("White"), alleges that Ford paid him a lower salary than his white co-workers for the same work. The undisputed facts pertinent to this case are as follows. Where there are disputes, that fact is noted.

---

[1]

Ford's motion for summary judgment was filed on January 7, 2008. (ECF Doc. 37.) Due to his counsel's serious illness and recovery, the Court granted White several extensions of time, and his response in opposition was timely filed on August 15, 2008. (ECF Doc. 44.) After a single extension of time, Ford timely filed a reply on September 18, 2008. (ECF Doc. 48.)

White is a 2001 graduate of Florida A&M University, where he received a Bachelor's Degree in chemical engineering.  While in college, White interned at a Ford plant in Michigan in the Environmental Engineering Department.  Upon graduation, White worked at Ford's Ohio Assembly manufacturing plant in Avon Lake, Ohio as an engineer from May of 2001 until he resigned September 1, 2006.  During his tenure at Ford, White took classes at Cleveland State University and received a Master's Degree in Environmental Studies in the Spring of 2005.

Ford hired White in 2001 as a Manufacturing Engineer at Salary Grade 5.  For approximately two years, White worked as a Manufacturing Engineer and rotated through several departments as part of Ford's College Graduate Program, which is designed to familiarize employees with the operation of the entire Ford system.  Upon completing his rotation in May of 2003, White returned to the plant engineering department.  While still a Manufacturing Engineer in the plant engineering department, White received a promotion to Salary Grade 6 on June 1, 2003, and a merit-based raise on July 1, 2003.

In the Summer of 2004, one of White's supervisors, Jim Lucas,[2] asked White to work with the plant's only Environmental Control Engineer, Warren Cohen.  Cohen had been an environmental engineer for 27 years when Ford hired him to be the Environmental Control Engineer in 1995.[3]  Cohen's health was failing, however, and Lucas wanted White to shadow Cohen and learn his duties, *e.g*, preparing reports related to wastewater, waste, and air, preparing annual reports, and doing material inventory.  By the fall of 2004, White had been exposed to all of Cohen's duties and was

---

[2]  Jim Lucas was the Manufacturing Planning Manager during White's tenure at Ford and, therefore, one of his supervisors.  (ECF Doc. 34, *Lucas Dep*. 6-7.)

[3]  In fact, the resume Mr. Cohen submitted with his application to Ford details a long and impressive record of environmental engineering work experience.  (*See* ECF Doc. 37-2, *Def. Br. Mt. Summ. J.*)

2

assisting in performing some of them, such that his additional duties shadowing Cohen amounted to half of his day-to-day activities.

Anticipating Cohen's retirement, Ford advertised for the position of Environmental Control Engineer in February of 2005. White applied for the position. Cohen's health was questionable and he had to take leave effective March 11, 2005. In the spring of 2005, Ford's plant management committee made a plan for White to continue to learn Cohen's position and perform the duties of the Environmental Control Engineer for one year. The plan was to re-evaluate his status and performance in the position in March of 2006. White thus assumed some of Cohen's duties at both the Avon Lake plant, and Ford's smaller Lorain Assembly Plant, which was closing, but did not fully step into Cohen's role as the Environmental Control Engineer until late in 2005. Beginning at the end of July, 2005, White began spending two days per week at the Lorain Assembly Plant.

While training for and performing some of the duties of the Environmental Control Engineer, White remained classified as a Manufacturing Engineer. On July 1, 2005 he received a merit-based salary increase related to completion of his Master's Degree.

White began questioning the fairness of his salary and continuing classification as a Manufacturing Engineer in May of 2005, soon after he assumed some of the responsibilities of the Environmental Control Engineer. He spoke to numerous Ford employees, including the supervisor, Jim Lucas, his direct supervisor, Plant Engineering Manager Jim Harris, Human Resources Manager Elizabeth Burke, and Salaried Personnel Manager Don Penrod. Lucas, Harris, Burke, and Penrod told White that, due in part to the closing of the Lorain Assembly Plant, no promotions were being approved at the time and, regardless, his inexperience in the position did not justify promotion to Salary Grade 7 or 8.

Significantly, in questioning the fairness of his salary, White never once couched his complaints in racial terms or suggested to anyone at Ford that the reason his salary was unfair was because he is a minority.  Instead, the basis of his complaints was that he was entitled to a higher salary based on the nature of his job responsibilities and education.  Thus, nothing in the record suggests that White raised the issue of race discrimination to anyone at Ford prior to filing his EEOC charge, and no claim for retaliation has been asserted in this case.

White's supervisors, Lucas and Jim Harris, met with White on March 31, 2006 in accordance with the company's plan to review White's performance in the position after one year and to discuss several performance-related issues.  (ECF Doc. 44-2, *Pl. Aff.* Ex. 23.)  First, they expressed concern regarding his lack of timely verbal communication with them about environmental issues that might affect the plant.  They reminded him that the importance of such communication had been part of his training.  Second, they told him to inform his immediate supervisor, Harris, of any environmental issues related to the plant prior to discussing them with Ford employees outside the plant.  Finally, they told him that, even after the one-year trial period, they did not believe White was yet entitled to a promotion to a higher salary grade.  They reminded him that his performance evaluation – "Excellent Plus" -- was for the Manufacturing Engineer level, not Environmental Control Engineer.

In April of 2006, just weeks after his March 31 meeting with his supervisors, White filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  (*See* ECF Doc. 1, Ex. A.)   In June of 2006, White applied for the position of Environmental Control Engineer at the Cleveland Casting Plant.  The posted salary range for the position was Salary Grade 6 to 8.  Ford offered the position to White at Salary Grade 6.  He accepted and voluntarily transferred

to Ford's Cleveland Casting Plant at the end of July, 2006.[4]  He held the position for about one month before resigning.  At the time of his resignation, White's annual salary was $65,000.00.

On October 11, 2006, the EEOC made a finding that it was "unable to conclude that the information obtained establishes violations of the statutes" and issued a right to sue letter.  (*Id*. Ex. B.)  On December 8, 2006, White filed the Complaint (ECF Doc. 1-3) in the Lorain County Court of Common Pleas.  Ford filed a Notice of Removal on January 12, 2008 based on White's federal race discrimination claim, and the case was removed to this Court.  (ECF Doc. 1.)  The Complaint alleges two causes of action: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); and (2) race discrimination in violation of Ohio Revised Code § 4112.02.  (*Id*.)  The essence of White's claims is that he was paid a lower salary than white Environmental Engineers employed by Ford because he is African-American.

## II.  **LAW & ANALYSIS**

### A.  **STANDARD OF REVIEW**

This case arises on Ford's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> (1) *In General*.  A supporting or opposing affidavit must be made on personal

---

[4]     Ford replaced White at the Ohio Assembly plant with Tamberlyn Shell, an African-American woman, at Salary Grade 8.

knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

(2) *Opposing Party's Obligation to Respond*. When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate,  be entered against that party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 560 (6th Cir. 2004).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material

6

fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### B.  Jurisdiction

Ford submits in its notice of removal that this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*Complaint* and *Answer* at ¶ 4.)

The Court is satisfied that it has jurisdiction over each claim in this case for the reasons asserted in Ford's notice of removal. The Title VII race discrimination claim arises under federal law, and White has fulfilled the requirement to exhaust his administrative remedies before filing suit. He filed charges with the EEOC, and the Commission issued a Notice of Right to Sue letter. (*Complaint* and *Answer* at ¶ 46; Doc. 1-2.) Approximately two months later, White timely filed the complaint in this case. (Doc. 1-3.) In addition, the Court has pendant jurisdiction over White's state law race discrimination claim pursuant to 28 U.S.C. § 1367.

C.     **Analysis**[5]

Race discrimination may be proven through either direct or circumstantial evidence.  *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003 (*en banc*).  When, as here, the plaintiff submits only circumstantial evidence, the familiar *McDonnell Douglas* burden-shifting approach applies.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

At the first stage in the *McDonnell Douglas* analysis, White bears the burden of establishing a *prima facie* case of discrimination.  *See Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).  To satisfy the elements of his *prima facie* case, White must establish that: (1) he is a member of a protected class; (2) Ford subjected him to an adverse employment action; (3) he was qualified for his job; (4) he was either replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.  *Id.* (citing *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).

If White establishes a *prima facie* case, the burden shifts to Ford to submit a legitimate non-discriminatory reason for the adverse employment action.  If Ford satisfies the burden, the burden shifts back to White to establish that the proffered reason is actually a pretext for unlawful discrimination.  *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  As the Sixth Circuit recently explained:

> Pretext may be established "either directly by persuading the [trier of fact] that a
> discriminatory reason more likely motivated the employer or indirectly by showing

---

[5]     White is asserting race discrimination claims under both federal and Ohio law. Ohio courts recognize that the federal case law applicable to Title VII cases also applies to race discrimination claims asserted under Ohio law. *See Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). Accordingly, White's two claims will be analyzed together.

that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir.2008) (citing *Manzer*, 29 F.3d at 1084).

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392-93 (6th Cir. 2008) (*en banc*).  If White cannot satisfy his burden at the pretext stage, Ford is entitled to summary judgment.

Ford only challenges one element of White's *prima facie* case – that non-protected, similarly-situated employees were treated more favorably than he.[6]  In addition, Ford argues that, even if the Court decides that White has made out a *prima facie* case of race discrimination, he cannot establish that Ford's legitimate non-discriminatory reasons for deciding not to increase his salary were a pretext for discrimination on the basis of race.  Thus, there are two issues for the Court to resolve: (1) whether non-protected similarly situated Ford employees were treated better than White, and (2) whether White has established pretext.  The Court will consider these issues in order, and ultimately concludes that Ford's arguments on both elements are well-taken.

### 1.    Disparate Treatment of Non-Protected Similarly-Situated Employees

Ford argues that White has not identified any similarly-situated Ford employee treated more favorably than he.  To be treated as similarly-situated, an employee must "have dealt with the same supervisor [as the plaintiff], have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.

---

[6]    Ford thus concedes that White is a member of the protected class, was subjected to an adverse employment action, and was qualified for his job.  *See Russell*, 537 F.3d at 604.  He is not arguing under the alternative prong of the fourth element – that he was replaced by someone outside the protected class – because his replacement is African-American.

9

1992).[7]  The plaintiff need not demonstrate similarity in all respects; the Court will evaluate the above factors to the extent they are relevant to the particular circumstances of the case.  *See Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 394 (6th Cir. 2008) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  This caveat is important because, if the definition of "similarly-situated employee" is too narrow, then an individual with unique job responsibilities would be precluded from asserting a potentially meritorious discrimination claim.  *Id*. at 396-97.

If White can identify a field of similarly-situated employees, the question becomes whether Ford treated any of the non-protected employees in that field better than White with respect to his wage parity claim.

### i.  Whether White Identified a Similarly-Situated Employee

Ford contends that the only employee comparable to White was Warren Cohen.  Cohen held the position of Environmental Control Engineer prior to White and was paid at Salary Grade 8, but Ford argues that Cohen and White are not similarly situated because of Cohen's decades of pertinent experience as an environmental engineer.  Because Cohen is not similarly-situated and was the only other Environmental Control Engineer at the Ohio Assembly and Lorain Assembly plants, Ford argues that White cannot establish disparate treatment.

In response, White takes issue with limiting the universe of similarly-situated employees to the Ohio Assembly and Lorain Assembly plants for the reasons articulated by the Sixth Circuit in

---

[7]     Subsequent Sixth Circuit opinions divide this passage from the *Mitchell* opinion into discrete factors to apply in determining whether the employee(s) to whom the plaintiff seeks to compare himself is "similarly-situated."  *See e.g., Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008).  They are often referred to as the "*Mitchell* factors," and are as follows:  that the employees to be compared (1) dealt with the same supervisor; (2) were subject to the same standards; and (3) engaged in the same conduct without distinguishing circumstances.

*Jackson*, 518 F.3d at 394.  Instead, White proposes that the Court should treat Environmental Control Engineers at Ford plants nationally as the field of similarly-situated employees.

Both arguments have some appeal.

First, the Court agrees with Ford's contention that Cohen is <u>not</u> similarly situated because he was substantially more experienced than White, both as an environmental engineer and as a Ford employee.  The Sixth Circuit has consistently recognized that employees who are substantially more experienced are not "similarly situated."  *See, e.g.*, *Young v. Oakland County*, 176 Fed Appx. 644, 649-50 (6th Cir. 2006) (unpublished) (finding that substantially more experienced job candidate was not a similarly situated employee); *Hatchett v. Health Care and Retirement Corp. of Am.*, 186 Fed. Appx. 543, 548-49 (6th Cir. 2006) (unpublished) (same); *Campbell v. Hamilton County*, 23 Fed. Appx. 318, 326 (6th Cir. 2001) (unpublished) (same).

Nonetheless, the Sixth Circuit has recognized and discussed the principle at the heart of White's argument, *i.e.*, that the fact that the only other environmental engineer at the Ohio and Lorain Assembly Plants was more experienced should not automatically deprive White of the opportunity to present a discrimination claim at the *prima facie* stage.  *Jackson*, 518 F.3d at 394 (discussing *Ercegovich*, 154 F.3d 344, 352-53 (6th Cir. 1998).  Indeed, the Sixth Circuit addressed a similar issue in *Ercegovich*, where the plaintiff, Ercegovich, asserted an age discrimination claim arising out of the defendant company's failure to transfer him following a reduction-in-force.  The Sixth Circuit reversed the district court's holding that, because Ercegovich, who had twenty-two years of experience with the company,  performed different job functions than the younger members of the human resources department who were retained, he could not be considered "similarly situated" under the test articulated in *Mitchell*.  *Id*. at 352-53.   The Sixth Circuit held that "the

11

district court misconstrued this circuit's precedent in applying an exceedingly narrow reading of the *Mitchell* decision." *Id*. at 352.   Its reasoning mirrors White's argument in this case:

> [U]nder the district court's narrow reading of *Mitchell*, an employer would be free to discriminate against those employees occupying "unique" positions.  This circuit has never endorsed such a narrow construction of *Mitchell*.  Rather, as explained above and as held previously by this court in *Pierce*, [*v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994)], we simply require that the plaintiff demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects.  A contrary approach would undermine the remedial purpose of the anti-discrimination statutes.

*Id*. at 353 (emphasis in original).  Applying this principle, the Court held that all of the members of the human resources department could be considered "similarly-situated" for purposes of Ercegovich's *prima facie* case.  *Id*.

More recently, in *Jackson*, 518 F.3d at 396, the Sixth Circuit applied its reasoning in *Ercegovich* in finding, again, that the district court applied the *Mitchell* factors too rigidly.[8]  The Court, moreover, noted that the "*prima facie* showing requirement is not onerous . . . ." *Id*. (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In sum, the Sixth Circuit employs the *Mitchell* factors loosely, and each factor does not apply in every case.  *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (noting flexibility of *Mitchell* factors in disparate discipline case and quoting *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003) holding that employees may be similarly situated even if they worked for different supervisors); *Berry v. City of Pontiac*, 269 Fed. Appx. 545, 550 (6th Cir. Mar. 14, 2008) (unpublished) (citing *McMillan* in a disparate discipline case for the proposition that plaintiff and his comparable need not have had the same supervisor in every case); *Gibson v. Shelley Co.*, 2008

---

[8]      In fact, the Sixth Circuit has noted that the *Mitchell* factors are applied "primarily in the disciplinary context" but are relevant considerations in other discrimination cases.  *Jackson*, 518 F.3d at 396 n.4 (citing *Ercegovich*, 154 F.3d at 352).

12

WL 3876432, at *11 (6th Cir. Aug. 19, 2008) (evaluating similarly situated issue with respect to employees subject to the same decision-making committee, not the same supervisor); *but see Hatchett*, 186 Fed. Appx. at 548-49 (holding that plaintiff could not satisfy her *prima facie* case of race discrimination because "differences in job title, responsibilities, experience, and work record" did not support comparable nurses being treated as similarly situated).

White relies in particular on a Southern District of Ohio case discussing this principle. *Sauer v. Univ. Internal Med. Ass'n*, 2008 WL 731492, at *9 (S.D. Ohio Mar. 17, 2008). In *Sauer*, the plaintiff was a Senior Accountant who was transferred to a different department within the company, in part because of poor performance in his prior role. *Id*. at *1-5. As part of the transfer, his salary was reduced, and he alleged that he was being discriminated against on the basis of his age. *Id*. at *4-5. In discussing the "similarly-situated" element of his *prima facie* case, the Court noted that he had been the only Senior Accountant at the company, and, therefore, no similarly-situated non-protected employees existed. *Id*. at *9. Citing *Ercegovich*, the court thus held that, for purposes of his *prima facie* case, the other accountants in the department to which he was transferred could be treated as similarly-situated. *Id*.

White does not, however, cite, nor has the Court identified, any case in which a court has defined similarly-situated employees as broadly as White proposes; *i.e.*, all Environmental Control Engineers working at Ford nationally, regardless of their supervisors, duties, or levels of experience. A flexible application of the *Mitchell* factors might arguably support White's definition, given that he does submit some factual support for the notion that Ford attempts to define positions consistently from plant to plant, (*see Pl. Br. Opp'n Summ. J.*, *White Aff.*, *Ford Policy Guide – Position*

13

*Evaluation*, Ex. A6), and given the Sixth Circuit's recognition that the plaintiff's burden at the *prima facie* stage is not onerous.

On the other hand, Ford presents unrebutted testimony indicating that engineering roles vary from plant to plant and that each plant manager has significant discretion regarding job responsibilities, salary, and oversight.  (*See Lucas Dep*. 46; ECF Doc. 45, *Davis Dep.* 36-39.) White's job, which included both Manufacturing Engineer responsibilities and Environmental Control Engineer responsibilities at two different plants, provides a concrete example of the way in which a Ford engineer's job responsibilities are unique from plant to plant.  This fact would put the Court in the untenable position of treating employees who, in fact, have decidedly different jobs, as if they are similarly-situated and should therefore be entitled to equal compensation under Title VII solely because there is an unbridgeable factual gap in plaintiff's proofs.

Ford also points out that its Salary Grade determinations employ a fifteen-factor test which places emphasis on, among other things, experience – both inside and outside of Ford – and number of years at ones' current Salary Level.[9]  These factors are critical to this analysis because, as the Sixth

---

[9]      The *Ford Policy Guide – Position Evaluation* exhibit to White's affidavit describes the factor-based test applicable to determining the appropriate Salary Grade for each position compensated within the range of Salary Grade 1-8.  It provides as follows:

> The point factor system contains 15 factors.  Each factor is divided into levels, with predetermined numerical point values assigned to each level.  The points available for each factor are the same for all job titles and job families.
> . . .
>
> The evaluation factors are as follows:
>
> Experience, Knowledge and Skill
> •        Previous experience
> •        Specialized education

14

Circuit has repeatedly pointed out, employers with substantially differing experience levels should

not be deemed "similarly-situated."  *See, e.g.*, *Young*, 176 Fed Appx. at 649-50.  White effectively

asks this Court to ignore these distinctions by proposing a class of "similarly-situated" employees

that ignores them and is defined by only one of Ford's own fifteen factors – education level.[10]

Ultimately, the Court finds that, even if it interprets the *Mitchell* factors very loosely, White

cannot satisfy his *prima facie* burden because he has not identified any similarly-situated non-

----

- •    Manual/physical skill
- •    Physical Effort

Work Complexities
- •    Complexity
- •    Seriousness of errors

Working Conditions
- •    Hazards
- •    Adverse conditions

Contacts
- •    Contacts with outsiders
- •    Internal contacts

Responsibilities
- •    Safety of others
- •    Funds and property
- •    Confidential information
- •    Work without supervision
- •    Supervising others

(*Ford Policy Guide – Position Evaluation*, *White Aff.* Ex. A6.)

[10]   White's position demonstrates a fundamental misunderstanding of Ford's system for determining appropriate compensation for each employee.  His argument is essentially premised on the notion that each job has a defined Salary Grade attached to it and that salary increases proceed in a lock-step fashion.  His position leaves no room for discretion on the part of plant management and pares the fifteen factor test down to a few factors conveniently applicable to his circumstances.  In fact, as the record makes abundantly clear, Ford's system is specifically designed to account for the totality of the circumstances with respect to each job, each employee, and each plant.  (*See, e.g.*, *Ford Policy Guide – Position Evaluation*, *White Aff.* Ex. A6; *Lucas Dep.*, Ex. 22.)  Despite White's protestations, this is precisely what makes it an ostensibly fair system.

protected employees.  S*ee, e.g.*, *Hatchett*, 186 Fed. Appx. at 548-49.  Simply, the comparisons he seeks to draw are not fairly defined, ignoring numerous meaningful differences between his personal circumstances and the working circumstances of those to whom he compares himself.

### ii.    Disparate Treatment

Even if the Court accepts White's broad definition of similarly-situated employees for purposes of his *prima facie* case, moreover, it is clear that White's *prima facie* case only succeeds if he can show that the protected and non-protected employees in this class were treated differently in material respects.   Assuming for the sake of analysis that the other Environmental Control Engineers at Ford are similarly-situated, White has presented scant evidence indicating that Ford treated non-protected Environmental Control Engineers more favorably than he, however.

White argues that, while he was paid at Salary Grade 6 for performing the role of Environmental Control Engineer at the Lorain and Ohio Assembly plants, analysis of the salaries of all of Ford's Environmental Control Engineers reveals that, on a company-wide basis, Environmental Control Engineers were usually compensated at Salary Grade 7 or 8, not 6.  White therefore contends that he should have been promoted to Salary Grade 7 *when he began* performing the duties of an Environmental Control Engineer in the spring of 2005.  Furthermore, he argues that his assumption of the duties of Environmental Control Engineer was a "non-series promotion" to a "higher graded/level position" entitling him to a salary increase under Ford's own compensation policies. He argues that, consequently, Ford's failure to promote him is indirect evidence of discrimination sufficient to satisfy his *prima facie* burden.

At the heart of both of White's arguments is the assumption that all Environmental Control Engineers are entitled to earn Salary Grade 7 underlined immediately upon promotion to the position.  The

16

Court acknowledges that White has submitted evidence that Environmental Control Engineers are often paid Salary Grade 7 or 8, and frequently hired at that Salary Grade. (*Pl. Br. Resp. Summ. J.*, Ex. A9.) Viewed in context and in its entirety, however, this same evidence indicates that the position is considered a Salary Grade 6-8 position and that compensation within that entire range is based on the usual considerations, including experience, education, and expertise.

In support of his argument that, company-wide, Environmental Control Engineers are paid at Salary Grade 7 or 8, White submits a spreadsheet he compiled based on documents produced by Ford's human resources department. (*Pl. Br. Resp. Summ. J.*, Ex. A9.) The spreadsheet purportedly[11] summarizes over three-hundred pages of information regarding the salaries of thirty-two Ford Environmental Control Engineers. White points out that the spreadsheet shows that:

> [A]s of October 2005, every environmental control engineer identified was either a Grade 7 or 8. All were Caucasian except one. It also shows from June 1, 2000 to December 31, 2006, 12 individuals were promoted to the position in those plants and all but one started as a Grade 7 or higher. The one individual who began as a Grade 6 was Rhonda Turner at the Chicago Assembly Plant. Ms. Turner, as noted, had a Bachelor's degree in environmental science in 2001 when she was promoted in contrast to the Plaintiff's engineering and master's degree in environmental technology. Many of the others were not graduate engineers and/or did not hold Master's Degrees.

(*Pl. Br. Resp. Summ. J.* 9.) This is all true. White omits, however, the fact that seven of these thirty-two individuals, all Caucasian males, were <u>hired</u> into the position (prior to October 2005) at Salary Grade 6, <u>just like White</u>. In addition, with respect to his argument regarding Ms. Turner, White is

---

[11]    The spreadsheet is an attachment to White's affidavit, Ex. A. It is neither a document produced in discovery nor an expert report. The Court accepts the spreadsheet under Rule 56(e) as a reflection of White's personal knowledge of the documents on which it is based. In his affidavit, he attests to the truth and accuracy of the information on the spreadsheet. (*See Pl. Aff.*, Ex. 9.) Further, Ford expressly admits the accuracy of the initial Salary Grade level of the seven Environmental Control Engineers who began at Salary Grade 6. (*See Def. Br. Reply* 7.)

essentially saying that she is not similarly situated because she has a different level of education. He neglects to mention, however, that, unlike Ms. Turner, four of the seven individuals who were hired at Salary Grade 6 had masters degrees like White.[12]  Therefore, even if the Court accepts White's new definition of similarly-situated employees–the sub-class of Environmental Control Engineers at Ford who have earned masters degrees–the evidence does not support his contention that he was automatically entitled to a promotion from Salary Grade 6 to Salary Grade 7.

With respect to his "non-series promotion" argument, White argues that the job of an Environmental Control Engineer involves "substantially different responsibilities" than those of a Manufacturing Engineer, his prior position.  As a result, he contends that he received a "non-series promotion" when he became the Environmental Control Engineer and, therefore, under Ford's policy concerning promotional pay increases, he was automatically and immediately entitled to a Salary Grade promotion from Salary Grade 6 to Salary Grade 7.  As noted above, moreover, White does not adequately analyze the experience levels of those who were promoted into environmental engineering positions at a level 7.  Again, he ignores Ford's interest in rewarding years of work experience, especially those at Ford, or of acknowledging working at a lower Salary Grade level for some period of years, when making decisions regarding where to start the employees it places into positions governed by a Salary Grade 6-8 range.  It is plaintiff's burden to establish disparity in treatment, but White makes little effort to do so.

---

[12]    This argument is also somewhat disingenuous: after arguing that the definition of similarly-situated should include all Environmental Control Engineers, White now attempts to conveniently narrow the field to just those with the same educational background as himself.  Although this distinction may be legitimate in light of the *Mitchell* factors, White should not be allowed to redefine the field of similarly-situated employees when it is personally beneficial to do so.

In support of this argument, White submits Ford's promotional pay increases policy (*see Pl. Br. Resp. Summ. J.*, Ex. A7) and Ford's position evaluation policy (*see id.*, Ex. A6).  He also references deposition testimony from Ford employees stating that the jobs of an Environmental Control Engineer and a Manufacturing Engineer involve different responsibilities.  (*See id.* 7.) Lastly, he notes that Human Resources Manager Don Penrod requested in an email dated October 6, 2005, that White receive a non-series promotion to Salary Grade 7 in connection with his assumption of the duties of the plant's Environmental Control Engineer, and that plant manager Jim Lucas refused to authorize the promotion.  (*See id.*, Ex. C.)

The Court construes these facts in the light most favorable to White, and notes that they are supported by the record.  However, these facts do not establish that White was automatically *entitled* to a promotion to Salary Grade 7.  First, the mere fact that the two engineering positions had "different" responsibilities does not mean that one was at a higher pay grade than the other.  White presents no evidence that the positions, though "different" in terms of day to day functioning, were not otherwise comparable in terms of responsibilities and pay structure.  There is simply nothing in the record to support the conclusion that a transition from one set of responsibilities to the other was, by definition, a promotion.  This is especially true when one considers that White's transition into the position was effectuated over time, as he was learning the job. Second, the promotional pay increases policy upon which White relies expressly states that "promotional increases are reviewed and approved by your local management," (*see id.*, Ex. A7), in this case, Jim Lucas.  Lucas testified that he specifically verified with Don Penrod in the personnel department that the Environmental Control Engineer position did <u>not</u> have a specific Salary Grade attached to it.  (*Lucas Dep.* 45.)

Michael P. Davis, the former[13] Regional Environmental Quality Manager at Ford, and Andrew Hobbs, Director of Ford's Environmental Quality Office, corroborated these facts – there was no uniform pay grade for these positions because the scope of responsibilities in them was so plant specific.  (*Davis Dep.* 61-62; ECF Doc. 47, *Hobbs Dep.* 4, 19.)  Davis emphasized that the responsibilities of environmental engineers vary from plant to plant, and the way responsibilities are divided and assigned is a plant decision.  (*Davis Dep.* 36-39.)  This explains Don Penrod's email to Jim Lucas questioning whether White should be promoted to a Salary Grade 7, and Jim Lucas' response.  Second, the position evaluation policy is designed to "achieve consistency in the assignment of salary grades and classifications for positions with the same level of responsibility," but employs a fifteen factor test applicable to each employee's specific job.  (*See id*., Ex. A6.)  As noted, that fifteen factor test places emphasis not only on the nature of the precise responsibilities, but the employee's level of experience, both in the field and at Ford generally.  Therefore, neither policy establishes that White's job was definitively classified as a Salary Grade 7 or higher.

Additionally, although Don Penrod's email proposes giving White a non-series promotion to Salary Grade 7, Jim Lucas's response to the email indicates that he believed the position was not "salary level dictated" and that there were reasons why a salary increase for White was premature at that point.  (*Id*. Ex. C.)  The unrebutted testimony of Ford employees, at both the corporate and plant level, establishes that there was no lock-step mechanism for determining ones Salary Grade <u>within</u> <u>the</u> <u>defined</u> <u>range</u>.  When White transferred to the Cleveland Casting Plant, moreover, he accepted the Environmental Engineer position at Salary Grade 6.  (*White Dep.* 37-38.)  In fact, the

---

13      Davis retired from Ford in January of 2007.

Ford Job Posting for the position listed the Environmental Engineer position as a Salary Grade 6-8. (*Id*.)[14]

White's disparate treatment argument thus depends on disparate treatment within the recognized range of Salary Grade 6-8 for an Environmental Control Engineer at Ford.  There is a fundamental difference between being paid a salary at the low-end of a range and being paid a salary so low that it is not even within the range.  White has simply not established that, when all factors

---

[14]     Regarding Exhibit 2 to his deposition, the job posting for the position he eventually accepted at the Cleveland Casting Plant, White testified at his deposition as follows:

> Q.  We'll mark this Defendant's Exhibit 2.  Do you recognize this document?
> A.  Yes.
> Q.  And what do you recognize it to be?
> A.  The posting for the position at Cleveland Casting.
> Q.  For the environmental engineer position.
> A.  Yes.
> Q.  For the job that you applied for?
> A.  Yes.
> Q.  You see somewhat midway down it says Salary Grade/Level?
> A.  Yes.
> Q.  What does it say that the salary grade/level is?
> A.  6 to 8.
> Q.  And this is the job posting that you responded to for the Cleveland Casting position?
> A.  Yes.
> Q.  And you were offered that job?
> A.  Yes.
> Q.  And what was the salary grade for that position?
> A.  It was a lateral move, so it was the exact same thing that I had at Avon Lake.
> Q.  Which was?
> A.  6.
> Q.  So you accepted the position at Cleveland Casting for the environmental control engineer position at salary grade 6?
> A.  Yes.

21

are taken into account, including the range of duties, education, experience, time at Ford, etc., that there are individuals outside the protected class who were treated differently than he.  Indeed, it appears that many outside the protected class faced the <u>same</u> treatment – starting at the low end of the salary range and spending sufficient time in the job to justify a request to move up in that range.  Thus, even if the Court assumes that the universe of similarly-similarly situated non-protected employees is limited to the Ford Environmental Control Engineers who have masters degrees, it is clear that many others with that same education level started at the same Salary Grade as White.  White has not established, moreover, that those with a masters degree who did start at a Salary Grade 7 were similarly-situated in other material respects.  Even putting aside their differences in plant location and supervisory authority, White makes no effort to establish that the scope of their job duties or levels of experience, or that application of any of the other factors in the fifteen factor test for Salary Grade determinations, justify the conclusion that White received "disparate treatment" with respect to his Salary Grade.

### 2.    Legitimate, Non-Discriminatory Reason and Pretext

Even if White establishes his *prima facie* case, he must demonstrate, moreover, that Ford's proffered legitimate non-discriminatory reason for choosing not to give White a Salary Grade promotion was a pretext for discrimination on the basis of race.  In other words, it is not enough for White to show that there were others who were similarly-situated to him who were treated differently than he with respect to their salaries, he must ultimately show that the disparate treatment he received was racially motivated.

### i.    Analysis of Ford's Legitimate, Non-discriminatory Reason

For its legitimate non-discriminatory reason for taking the challenged action, Ford submits

the following:

> Ford initially did not promote Plaintiff to the position of Environmental Control
> Engineer because **all** promotions at Ohio Assembly were on hold pending the
> consolidation of the Lorain and Ohio Assembly Plants. (*See* Pl. Dep. pp. 130-131, Pl.
> Dep. Ex. 13, Lucas Dep. p. 39.) Further, as explained above, due to inexperience and
> performance issues, Ford did not believe that Plaintiff was ready for a Salary Grade
> promotion.  (*See* Lucas Dep. pp. 11-13, 84-85; Pl. Dep. Ex. 21, Lucas Dep. Ex. 19.)

(ECF Doc. 37 at 11-12 (emphasis in original).)[15]  In sum, Ford asserts (1) that no promotions were

being considered at least during White's early tenure in the environmental control area, (2) that it

wanted to evaluate White's performance for some period following his transition because he had

only been out of college, and only with Ford, for about four years when he was asked to work in the

environmental control area and had no prior work experience in the field and (3) when it did have

the opportunity to evaluate his work, the reaction of his supervisors, while generally good, was not

universally positive.  Ford's position is not that White never would have been bumped up to a Salary

Grade 7, it is that White was not yet ready as of March of 2006 and that White simply was

demanding too much too fast.

In support of its proffered reasons, Ford points out that it designed a plan to evaluate White's

performance as the Environmental Control Engineer as he transitioned into the job and Cohen

transitioned out, a point White does not refute.   Specifically, White would be the acting

Environmental Control Engineer for a year, and Ford would re-evaluate his performance in that role

---

[15]    With respect to the performance issues referenced, recall that White's supervisors
– Lucas and Harris – told him that he was not communicating effectively with
them about environmental problems at the plant and improperly discussing such
issues outside the plant.

23

and his compensation in March of 2006.  Consistent with this plan, on March 31, 2006, Lucas and Harris met with White to discuss his performance.  Ford submitted Lucas' and Harris' notes summarizing this meeting as Exhibit 19 to Lucas' deposition.  (*Lucas Dep.* 95-96, Ex. 19.)  The notes corroborate Ford's proffered reasons for not promoting White to Salary Grade 7 summarized above.  In addition, Ford submitted an email from Harris to Lucas summarizing a meeting with White on February 6, 2006.  (*Lucas Dep.*, Ex. 22.)  The meeting was initiated by White to address his concerns regarding his Salary Grade.  In the email, Harris summarized his perspective on this issue at the time as follows:

> Is [White] doing a decent job? . . . Yes.  Is it at a grade 7 level? . . . Sometimes & sometimes not.  Could his work be at a grade 7 level? . . Yes.  Am I fully satisfied on his current performance with consolidation, ISO, water quality Etc.?  No.  I think he is selectively forcing his hand to better his wallet at times.

(*Id.*)  This email, which reflects the opinions of White's direct supervisor and was written prior to the March 31, 2006 meeting with White, generally corroborates Ford's position that while it was assuming White's Salary Grade would increase at some point, they did not believe his current performance justified the increase at that point in time.

Accordingly, Ford has proffered a legitimate, non-discriminatory reason for paying White less than some other non-protected Environmental Control Engineers at Ford nationally.

### ii.      Pretext Analysis

Since Ford has proffered a legitimate, non-discriminatory reason, the burden shifts back to White to establish that this reason is a pretext for discrimination on the basis of race.  For the reasons discussed below, the Court finds that White has not shouldered his burden on this issue, and Ford's motion for summary judgment is, accordingly, well-taken.

24

There are three ways of establishing pretext: White must show, by a preponderance of the evidence, that Ford's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). In addition, in order to survive summary judgment, White must not only establish that the proffered reason was a pretext, but that it was a pretext for discrimination on the basis of race; he must raise material facts sufficient to support a finding that discrimination on the basis of race was the real reason Ford chose not to promote him to Salary Grade 7. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Under the theme that "talk is cheap," (*Pl. Br. Resp. Opp'n Summ. J.* 11), White argues that genuine issues of fact exist with respect to whether Ford's proffered reasons for maintaining White at Salary Grade 6 are pretextual. White submits that Ford's proffered reasons are pretextual for four reasons: (1) job promotions were not, in fact, on hold; (2) his performance was excellent and he was qualified at Salary Grade 7 based on experience and education; (3) the affidavit of Clyde Dennis, a former African-American who worked at the Environmental Control Engineer under Lucas and left four years prior to the beginning of White's tenure at Ford, opines that Lucas is racially biased and discriminated against Dennis because of his race; and (4) Lucas is actually responsible for any performance issues attributed to White. White appears to be arguing under the first and/or second method of establishing pretext. That is, he contends that Ford's proffered reasons have no basis in fact or are not the actual reason for Ford's decision not to increase his salary. The Court will address each of White's arguments in turn.

25

### a.    Job Promotions Were Not on Hold

White argues that, despite the consolidation of the Ohio and Lorain Assembly plants, no internal policy prevented Ford from promoting him to Salary Grade 7 when he assumed the responsibilities of Environmental Control Engineer.  In support of his argument, White points out that employees were promoted to fill new jobs during this period and that he was given an in-series raise and an education-based raise during this period.  He also argues that Don Penrod's email suggesting a promotion to Salary Grade 7 undermines any argument that promotions were on hold.

The freeze on job promotions is supported by the record, however, and Ford's explanation for the freeze makes sense.  White testified that Human Resources Manager Elizabeth Burke told him that there would not be "any promotions until after the consolidation." (*White Dep.* 131.)  Ford argues that there is an important distinction between a freeze on wages and a freeze on job promotions, and that wages were never frozen.  As Lucas explains in his deposition, the freeze on job promotions was part of the effort to sort out which employees would have a job and which would not after the two plants were consolidated.  Promotions during this time period would only complicate the process.  Don Penrod's email is consistent with this explanation.  Penrod proposed in his email that White could be promoted, in part because the consolidation was almost over.  It was not necessary to freeze wages, however, because in-series and education raises would not affect the organizational chart of openings used to facilitate the consolidation analysis.

It is clear from the record, however, that the moratorium on promotions was only in place for a portion (albeit, a majority) of White's transition in job duties and, thus, while providing on explanation for the initial decision not to promote White, it does not necessarily account for the decision not to do so as late as March of 2006.

### b.    Experience & Performance Issues

White's second and fourth pretext arguments are related.  He argues that he would not have been transferred from the manufacturing engineer position to Environmental Control Engineer if Ford did not think he was experienced enough to handle the job and would not have kept him in it if it really believed he was not performing adequately.  He contends that Ford has not submitted any evidence indicating that the performance issues discussed at the March 31, 2006, meeting were legitimate, and he asserts that any deficiencies in carrying out his job responsibilities were attributable to Lucas's own failure to follow-through on White's requests.  He submits copies of his performance reviews showing consistently high marks, and notes that he was officially promoted to the Environmental Control Engineer position in the fall of 2005.   In his affidavit, he describes Lucas's failings as follows:

> 16.  Affiant says that he did not have any performance or compliance issues which exceeded target timing except where Mr. Lucas failed to follow-through as required.

> 17.  Affiant's job required that he work through Jim Lucas on a plant level as well as work through corporate offices.  He did not have the manpower or budget to resolve the issues.  Affiant says he would urge the department heads to take care of problems but when they did not, he would have to go to Lucas.  Time and again Lucas was too busy to immediately intercede or act at all and as a result, the problems remained unresolved within the time constraints.  As a result the Affiant started e-mailing him what had to be done.  Lucas complained to him and others about the numerous E-mails but Affiant felt it was necessary to deflect blame.  Affiant recalls one such problem in the paint shop.

(*White Aff.* ¶¶ 16-17.)  Similarly, White submits a copy of an email he wrote to plant manager Mona Rinehart regarding his frustrations with management's response to environmental issues raised by him in the course of his duties.  (*White Dep.* Ex. 24.)  In this email, White says that, after the March 31, 2006 meeting, he, Lucas, and Harris agreed to meet on Monday mornings to discuss

27

environmental issues.  White says that, as of June 14, 2006, not one meeting had actually occurred because Lucas always cancelled.  (*Id*.)

These arguments do not indicate that Ford's proffered reasons for not increasing White's salary were unsupported by the facts or did not actually motivate the decision to maintain White at Salary Grade 6.  White *was* inexperienced (a point he effectively ignores in his opposition), and he does not deny that he used email instead of communicating face-to-face with Lucas as directed.  He also does not dispute the veracity of the other performance issues raised by Lucas and Harris during the March 31, 2006 meeting.[16]

The record clearly establishes that White was an inexperienced environmental engineer – his 2001 undergraduate degree was in chemical engineering, he worked exclusively as a manufacturing engineer until 2004, and he did not get his masters degree in environmental studies until 2005.  The extent of his experience in environmental engineering was an internship in college, shadowing Warren Cohen, and performing in the position on a trial basis for a year.  As discussed above, compensation within the parameters of the Salary Grade system is within the discretion of the plant manager and Ford placed a great deal of emphasis on experience – both in the particular field and inside Ford itself – when making these determinations.  As Harris explained in his February 6, 2006, email to Lucas regarding White, his supervisors considered his expectations regarding pay raises unrealistic based on Ford's standard compensation practices.

> Getting general salary increases by promotion, academic, Etc every 6 months is certainly not the norm.  I was a grade 6 for 3 years before being promoted to a grade 7.  I was grade 7 for 3 years before my next promotion Etc.  I tried to explain that the proof is in the pudding.  You make your mark on merit.

---

[16]     Specifically, he never addresses whether he inappropriately communicated plant issues outside the plant, a problem about which Lucas and Harris expressed particular concern.

(*Lucas Dep.* Ex. 22.)  In fact, White acknowledges that Harris told him this in his summary of the same conversation: "Jim [Harris] felt as though my situation is not out of the norm for career paths at Ford.  Jim explained his career path as an example."  (*Id.*)  Quite simply, White's supervisors felt White had not yet "paid his dues," an expectation they felt was imposed uniformly on Ford employees – including themselves. (*See Lucas Dep.*, Ex. 22.)

With respect to his performance, Ford's perspective is not that White was performing inadequately, just that there was room for improvement and that he would be entitled to a Salary Grade promotion when he earned it.  Jim Harris's email, discussed above, clearly explains this.  White's affidavit describes his frustrations communicating with Lucas about environmental issues at the plant, but it does not indicate that White complied with Lucas's request to communicate issues face-to-face.  Thus, he has not demonstrated that this portion of Ford's proffered reason is unsupported.  Furthermore, given the important and time-sensitive nature of White's job – environmental compliance at a factory – Lucas's request is patently reasonable.  For example, Lucas testified at his deposition that, in February of 2006 there were some environmental compliance issues that did not get resolved in a timely manner, and, in his estimation, White's failure to communicate in person contributed to the problem:

> Q. . . . What did Jahi [White] fail to do?
> A.  Follow the one basic instruction I gave him when he got the job, and that was if there was anything that needed immediate attention, to come and stand in my doorway until he got an answer and make sure that we were never late, no surprises, anything.

(*Lucas Dep.* 84.)[17]  This testimony indicates that Lucas considered direct communication part of White's job.  Although White's frustrations over communicating with Lucas may be justified, the facts indicate that doing so face-to-face, as instructed, was part of his job.  Accordingly, he has not demonstrated that Ford's proffered performance-based reasons for refusing to promote him to Salary Grade 7 were unsupported or did not actually motivate the decision.

Accordingly, White has not shouldered his burden with respect to pretext under any of the three methods described in *Manzer*.  Ford's legitimate, non-discriminatory reasons are supported by facts sufficient to justify it and there is no indication that it is not the actual reason Ford chose not to increase White's salary.

### c.      The Clyde Dennis Affidavit

White's last pretext argument goes primarily to the *Hicks* requirement that the employer's proffered reason for the adverse action is actually a pretext for, in this case, race discrimination, not some other motive or purpose.  *See Hicks*, 509 U.S. at 515.  He submits the affidavit of Clyde Dennis, an African-American and former Environmental Control Engineer who worked for Ford under Jim Lucas.  (*Pl. Br. Opp'n Summ. J.*, Ex. F., *Dennis Aff.*)  Dennis was the Environmental Control Engineer prior to Warren Cohen – he held the position from 1986 to 1995.[18]

---

[17]      Similarly, Lucas testified:

> Jahi [White] had been instructed to come to my door, eyeball-to-eyeball, and talk to me.  Not write letters, not send text messages, but to come to me personally and see me which is the same instruction that had been given to all of our environmental engineers prior.

(*Lucas Dep.* 85.)

[18]      White and Dennis did not work at Ford together.  Dennis left in 1995 and White did not start until 2001.

The essence of Dennis's affidavit is that Lucas is a racist who treated him in a racially biased manner.[19]  Rule 56(e)(1), however, requires an affidavit offered in opposition to a motion for summary judgment to "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(e)(1). Because Dennis's affidavit is inadmissible character propensity evidence under Rule 404(b) of the Federal Rules of Evidence, and offers conclusory opinions with virtually no factual support, it does not satisfy this standard.[20]

The affidavit is offered to show Ford's intent to discriminate against White on the basis of race.  Although "intent" is one of the exceptions to the Rule 404(b) prohibition on character

---

[19]     In his affidavit, Dennis states that Lucas is racially biased and treated him less favorably than his white co-workers.   For example, he states that, when environmental issues arose and he requested Lucas's help, Lucas did not respond. When there were problems, Lucas blamed his own inattentiveness on Dennis.  As a result, Dennis began to submit his requests in writing.  Lucas complained about this technique.  Additionally, Dennis states that Lucas was insensitive to racial and personal issues.  For example, Dennis believes that Lucas placed a noose on his computer and was extremely callous when Dennis' wife miscarried.  He also states that Lucas replaced him with Warren Cohen in 1995 without telling him, threatened to lower his salary grade, and gave him inconsistent performance reviews. (*Dennis Aff*.)

[20]     Rule 404(b) states:

> (b) Other Crimes, Wrongs, or Acts.--Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

31

propensity evidence, the Court must employ a three-step test in evaluating the potential admissibility of Rule 404(b) evidence.

> [W]e have outlined a three-step process for the admission of Rule 404(b) evidence:
>
>> First, the district court must make a preliminary determination regarding whether there is sufficient evidence that the "other acts" took place. The district court must then determine whether those "other acts" are admissible for a proper purpose under Rule 404(b). Finally, the district court must determine whether the "other acts" evidence is more prejudicial than probative.
>
> *United States v. Lattner*, 385 F.3d 947, 955 (6th Cir.2004). *Accord United States v. Abboud*, 438 F.3d 554, 581 (6th Cir.2006); *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir.2003).

*United States v. Bell*, 516 F.3d 432, 440-41 (6th Cir. 2008); *see also McLeod v. Parsons Corp.*, 73 Fed. Appx. 846, 853 (6th Cir. 2003) (unpublished) (articulating Sixth Circuit test as including element that "other act must be similar enough and close enough in time to be relevant to the matter at issue"). Dennis' affidavit does little to satisfy the first prong of this showing. He describes Lucas as a difficult and insensitive boss and then jumps to the conclusion that it was Dennis' race that led Lucas to behave this way. Other than a single reference to an incident in 1994, which he admits he can not tie to Lucas, Dennis provides no facts to support the conclusion that Lucas' gruff behavior was racially motivated. The Court finds it particularly hard to leap to the conclusion Dennis posits, moreover, – *i.e.*, that it was his race rather than his performance that frustrated Lucas – when Lucas had to approve White's transfer into the environmental engineer's position as well as the hiring of White's replacement, who are both African-Americans. Thus, the Court is hard-pressed to conclude either that Dennis' affidavit is sufficient to establish that Lucas was guilty of race discrimination in the past <u>or</u> that his treatment of Dennis in 1994 and 1995 is probative of his motives *vis-a-vis* White ten years later.

Even if the Dennis affidavit can be classified as "other acts" evidence potentially admissible to prove "intent" or "motive," it is inadmissible under step three of the Sixth Circuit test because the potential for prejudice far outweighs its probative worth. The Court finds that it is too remote in time, too divorced from the facts in this case, and too laden with value judgments which are not based on facts to satisfy the admissibility standard. *See McLeod*, 73 Fed. Appx. at 853 (finding 404(b) evidence of prior employment discrimination lawsuits against defendant inadmissible). White was apparently in high school when Dennis left Ford. It would be inappropriate to attribute any a racially biased motive to Lucas with respect to White on the basis of alleged conduct a decade earlier. In addition, the conduct described in the affidavit is almost exclusively related to working conditions, not salary.[21]

Furthermore, as noted above, White has not shouldered his burden with respect to pretext generally; *i.e.*, he has not raised a material issue of fact refuting Ford's legitimate, non-discriminatory reason for refusing to give White a raise. Therefore, even if the affidavit were admissible, and the Court accepted the proposition that Lucas has a history of being racially biased in general and, as a result, treated Dennis unfairly, it does not follow that Ford's actions *vis-a-vis* White were a pretext for race discrimination. Although it would be some evidence under the second method of proving pretext (that the employer's proffered reason is not its actual reason), for the reasons discussed above with respect to the "intent" exception to Rule 404(b), it is of little probative value. This is

---

[21]     The Court recognizes that the prohibition on character propensity evidence fundamentally conflicts with the available evidence of employment discrimination under certain circumstances. *See generally* Lisa Marshall, Note: *The Character of Discrimination Law: The Incompatibility of Rule 404 and Employment Discrimination Suits*, 114 Yale L.J. 1063 (2005). Because the Dennis affidavit does not satisfy the relevance balancing-test of Rule 403, however, this is not an issue in this case and the Court need not discuss the intricacies of it here.

particularly true in light of Lucas' later hiring decisions, as noted above.  In other words, the notion that Lucas was a racist in 2005 is inconsistent with other conduct set forth in the record.  Therefore, White would not be able to establish pretext even if the Court were to consider the Dennis affidavit.

## III.  <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff Jahi White has failed to satisfy the "similarly-situated" element of his *prima facie* case of race discrimination, and, additionally, has failed to shoulder his burden with respect to pretext.  Accordingly, Defendant Ford Motor Company's *Motion for Summary Judgment* (ECF Doc. 37) is hereby **<u>GRANTED</u>** and this cases is **<u>DISMISSED</u>**.


**IT IS SO ORDERED.**

                                                                s/Kathleen M. O'Malley
_____
                                                                **KATHLEEN  McDONALD  O'MALLEY**
**Dated:**          **September 30, 2008**          **UNITED STATES DISTRICT JUDGE**